## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHIAS O. COLE, | ) |
| | ) |
| Petitioner, | ) CRIMINAL NO. 98-13J |
| | ) CIVIL ACTION NO. 00-296J |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) JUDGE GIBSON |
| | ) |
| Respondent. | ) |

# MEMORANDUM OPINION and ORDER

**GIBSON, J.**

This matter comes before the Court on the Petitioner's Motion to Vacate (Document No. 60 at

Criminal No. 98-13J) and Chief Judge Ambrose's Memorandum Opinion and Order (Document No.

83 at Criminal No. 98-13J and Document No. 2 at C.A. No. 00-296J) denying all of the Petitioner's

alleged grounds for relief therein except the claims for ineffective assistance of counsel found in

Grounds M and N of the Motion. The Court held an evidentiary hearing on December 6, 2005 and

March 20, 2006. The Petitioner's counsel having stipulated at oral argument that the Petitioner is not

pursuing Ground M found in the petition, *see* Transcript Volume II (Document No. 141 at Criminal No.

98-13J; Document No. 8, C.A. No. 00-296J )(hereinafter "TVII") p. 85, the Court issues this opinion

in order to analyze the one remaining ground of the Petitioner's Motion to Vacate. In accordance with

the analysis in this opinion the Motion to Vacate is denied.

Ground N of the Petitioner's Motion to Vacate alleges that his trial attorney, John J. Kerrigan,

Jr. (hereinafter "Kerrigan"), failed to investigate the arrest records of the Pennsylvania State Police

trooper who stopped the Petitioner on the Pennsylvania Turnpike which the Petitioner alleges would

have revealed that only "minorities make up [the Trooper's] victims" and thus would have caused a

different result in the suppression hearing. Petitioner's Motion, Ground N. With this understanding,

the Court now makes the following findings of fact:

1. Trooper Steven Shelley (hereinafter "Trooper Shelley") stopped the Petitioner's vehicle because of the traffic violations of crossing the center line, speeding and having an object hanging from the rearview mirror; Trooper Shelley also indicated that he believed that he could see two black males sitting in the Petitioner's vehicle, however, this observation did not form a basis for the stop. Transcript, Volume I, (Document No. 134 at Criminal No. 98-13J)(hereinafter "TVI.") pp. 32-38.

2. During 1996 and 1997, a Pennsylvania State Police traffic citation form or a warning form did not have an area for indicating the race/ethnicity of the person cited for a traffic violation or given a warning. TVI, p. 55.

3. The records of arrests involving Trooper Shelley and resulting in prosecution of individuals that were produced reveal nine total arrests from December 1996 through December 1997; eight of the arrested individuals were Caucasian and one individual was African-American. TVI, pp. 55-56.

4. The one vehicle stop involving an African-American related to Trooper Shelley indirectly only in that his K-9 unit was utilized to conduct a search after a stop of the African-American. TVI, p. 56.

5. The Petitioner related to Kerrigan that he wanted him to investigate the possibility of racial profiling as being the reason for Trooper Shelley's arrest of the Petitioner on the Turnpike based upon comments from jail personnel at the Bedford County Jail. TVI, pp. 61-63, 64-65.

6. Kerrigan indicated to the Petitioner that he would investigate Trooper Shelley's records for the day of the Petitioner's stop and Trooper Shelley's records of prior arrests. TVI, pp. 64-66.

7. Petitioner also spoke with Attorney John Kasaback (hereinafter "Kasaback") who practiced in the Cambria County area and inquired of him as to whether he could investigate the issue of racial profiling being conducted by Trooper Shelley and Kasaback indicated he would investigate it for the Petitioner. TVI, pp. 68-70.

2

8.    Petitioner was later informed by Kasaback that he could not associate with Kerrigan on the Petitioner's representation because Kerrigan was not going to share the fee for the Petitioner's representation. TVI, pp. 76, 78.

9.    Petitioner's Exhibit 1, a letter from Kerrigan to Petitioner dated June 17, 1998, indicates, *inter alia*, that Kerrigan consulted with Kasaback regarding Trooper Shelley concerning the practice of pretextual arrests, but indicates that Kasaback was unable to furnish any such information. TVI, p. 79, Petitioner's Exhibit 1.

10.   Nevertheless, Kerrigan made arguments based upon pretext traffic stops generally and pretext stops based upon racial profiling specifically before then-District Judge D. Brooks Smith in a suppression hearing and also the jury trial in this matter. TVI, pp. 91-92.

11.   Kerrigan also contacted Attorney Keeler regarding racial profiling or pretextual stops by the Pennsylvania State Police on the Pennsylvania Turnpike in the area of Bedford County, Pennsylvania prior to the Petitioner's trial. TVI, p. 99.

12.   Kerrigan devoted all of his practice of law at the time he represented the Petitioner and at the present time to criminal defense work in Pennsylvania state and federal court systems as well as some state and federal representation in New York and New Jersey and has "tried approximately two hundred and fifty criminal jury trials." TVII, pp. 4-5.

13.   Kerrigan "immediately" recognized the potential issue of pretext, in the sense that the traffic stop was an excuse to search for illegal substances, as a reason for the traffic stop of the Petitioner when he evaluated the criminal charges against the Petitioner. TVII, p. 9.

14.   Kerrigan initially raised the issue of a pretextual stop in the state prosecution of the Petitioner and then raised it again in the subsequent federal prosecution of the Petitioner. TVII, pp. 9-11.

15.   Kerrigan also explored the possibility of racial profiling before and after the suppression hearing in the state court prosecution by speaking to attorneys practicing in Bedford County, Cambria County, and Allegheny County, Pennsylvania as well as a professor of law at the University of Pennsylvania. TVII, pp. 11-12, 17-19, 38-41, 47-53. Petitioner's Exhibit B

16.   The individuals with whom Kerrigan spoke were unable to provide information specific to Trooper Shelley, who stopped the Petitioner on the Pennsylvania Turnpike, or any practice by him of racial profiling. TVII, pp. 11-13.

3

17. Kerrigan did not request any documentation that may have indicated Trooper Shelley's involvement in racial profiling but did question Trooper Shelley regarding the issue of racial profiling and argued such theory during the suppression hearing and jury trial of the Petitioner in federal court. TVII, pp. 14-15, 36-37.

18. Kerrigan also explored at the federal suppression hearing a potential issue with regard to the Petitioner's consent to search his vehicle that he gave to Trooper Shelley. TVII, pp. 32-33.

19. Kerrigan did not obtain an investigator for the Petitioner's defense of his federal indictment or, in particular, to pursue a defense theory of pretextual racial profiling. TVII, pp. 35, 37.

20. Petitioner indicated that after his federal suppression motion was denied that he wished to proceed to a jury trial rather than accepting any type of plea agreement. TVII, pp. 54-55.

The Court makes the following conclusions of law:

1. Petitioner's claim of ineffective assistance is governed by the two prong standard found in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984):

   A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

   Specifically, the Petitioner must demonstrate that Kerrigan's performance "fell below an objective standard of reasonableness" and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674, 693, 698 (1984).

2.    "The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial." *Id.* at 697, 104 S.Ct. 2052, 2070, 80 L.Ed. 674, 693.

3.    "A court can choose to address the prejudice prong before the ineffectiveness prong and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." *Rolan v. Vaughn,* ___ F.3d ___, 2006 WL 997383 at * 4(3d Cir. 2006) *citing Strickland,* at 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699.

4.    The Petitioner must affirmatively prove the prejudice that resulted from his counsel's ineffectiveness. *Strickland* at 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 697.

5.    Even if the Court were to assume that Kerrigan's performance as the Petitioner's legal counsel was deficient, the Petitioner has produced no evidence demonstrating that the failure of Kerrigan to conduct an investigation or search of records concerning racial profiling potentially being conducted by the Pennsylvania State Police or by Trooper Shelley specifically, beyond Kerrigan's contacts made with attorneys from western Pennsylvania regarding these matters, resulted in prejudice to the Petitioner's defense to the effect of causing the outcome of the trial to be unreliable as there was no evidence that an investigation would have revealed information that could confirm or disprove the racial characteristics of persons involved in motor vehicle stops that involved Trooper Shelley directly or indirectly.

In accordance with the above findings of fact and conclusions of law the Motion to Vacate is

denied.

In accordance with Third Circuit Local Appellate Rule 22.2,[1] this Court must now determine

if a certificate of appealability should issue to the Petitioner. The Court has denied the Petitioner's

claims on the merits and may issue a certificate of appealability if "the petitioner ...demonstrate[s] that

---

[1]Local Appellate Rule 22.2 reads: At the time a final order denying a petition under 28 U.S.C. § 2254 or § 2255 is issued, the district judge shall make a determination as to whether a certificate of appealability should issue. If the district judge issues a certificate, the judge shall state the specific issue or issues that satisfy the criteria of 28 U.S.C. § 2253. If an order denying a petition under § 2254 or § 2255 is accompanied by an opinion or a magistrate judge's report it is sufficient if the order denying the certificate references the opinion or report. If the district judge has not made a determination as to whether to issue a certificate of appealability by the time of the docketing of the appeal, the clerk shall enter an order remanding the case to the district court for a prompt determination as to whether a certificate should issue.

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542, 555 (2000). "Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"" *Miller-El v. Cockrell*, 537 U.S 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931, 949 (2003).

As a result of the analysis above, the Court will not issue a certificate of appealability to the Petitioner pursuant to 28 U.S.C. § 2253(c). This conclusion is reached because there is no evidence of record that the Petitioner's defense at trial was prejudiced by the failure of his trial counsel to conduct further investigation or inquiry into the issue of racial profiling beyond the measures the trial counsel took in contacting attorneys in western Pennsylvania concerning this issue. In the absence of a showing of prejudice, the Court cannot find that reasonable jurists would debate the Petitioner's claims or find this Court's conclusion incorrect. Thus, there has been no substantial showing that the Petitioner's Sixth Amendment Right to Counsel or any other constitutional rights were denied.

6

**AND NOW**, this 3rd day of May, 2006, in accordance with the foregoing opinion, IT IS HEREBY ORDERED THAT the Petitioner's Motion to Vacate (Document No. 60 at Criminal No. 1998-13J) is DENIED; IT IS FURTHER ORDERED THAT a certificate of appealability from this Order is DENIED pursuant to 28 U.S.C. § 2253(c).

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

7